IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ELAINE MUIR,

       Plaintiff,

vs.

                                No. CIV 00-716 MV/KBM

LINCOLN COUNTY and
ALEX HINSON,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court for consideration of Defendants' Motion for

Summary Judgment, filed January 29, 2001 **[Doc. No. 16]** and Plaintiff's Motion to Supplement

the Record, filed May 25, 2001 **[Doc. No. 26]**.  The Court, having considered the motions,

responses, replies, relevant law, and being otherwise fully advised, finds that Defendants' Motion

for Summary Judgment is well-taken and will be **GRANTED in part** and that Plaintiff's Motion

to Supplement the Record is well-taken and will be **GRANTED**.

## BACKGROUND

The following are the material undisputed facts.[1]  In October of 1998, Plaintiff Elynn

Muir[2] owned a piece of land upon which sat her residence, a red wooden house.  Ms. Muir's

property was located at the intersection of Gavilan Road and Prospect Road.  Ms. Muir's

---

[1]    The Court accepts as undisputed all facts admitted by both parties and all facts for which
no competent contrary evidence has been presented by the opposing party. *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[2]    Plaintiff's name is spelled "Elaine" in the complaint and, thus, in the case caption.
However, the evidence in the record makes it clear that Plaintiff's name is actually "Elynn."  The
caption will be amended to reflect the correct spelling of Plaintiff's name.

residence was located on a "bluff," overlooking the remainder of her property. Also on her property at that time were a white mobile home, two trailers, and a silver trailer cab. Russell Hammonds was renting all of these properties from Ms. Muir; he lived in one of the trailers and subleased the remaining properties to other tenants. The address of Ms. Muir's residence was 612 Gavilan Road. The address of the trailer occupied by Mr. Hammonds was 101 Prospect Road. There were, at that time, no obvious markings near the property to identify the address of the residence or of the trailer. Ms. Muir's residence was a substantial distance from the trailers.[3] Ms. Muir's residence had its own driveway, separate from the driveway leading to the trailers.

Mr. Hammonds was known to the Lincoln County Sheriff's Department as a "drug dealer." One morning in October of 1998, a confidential informant contacted the head of the Lincoln County Narcotics Enforcement Unit, Frank Hooper. Hooper had utilized this same confidential informant in the past and knew the informant's identity. The informant had, on prior occasions, provided Hooper with reliable and credible information regarding drug sales.

The informant told Hooper that: Mr. Hammonds was selling drugs out of his trailer; the informant had purchased drugs from Mr. Hammonds that morning; there was a "substantial" amount of drugs in Mr. Hammonds home but the drugs were being sold quickly; Mr. Hammonds owned the entire property upon which his trailer was located; all of the buildings located on the property, other than the white mobile home, were owned and/or controlled by Mr. Hammonds; and Mr. Hammonds owned several guns.[4] The informant also told Hooper that there was a red

---

[3]     The evidence in the record suggests that the residence could have been anywhere between thirty and two hundred yards from the trailers.

[4]     There is no evidence in the record to suggest that Mr. Hammonds's ownership of these guns was illegal.

wooden house on the property. The informant did not know whether anyone was living in the house, but stated that the house appeared to be "livable."

Hooper ordered Defendant Agent Alex Hinson to obtain a search warrant while Hooper and another officer, Gilbert Sambrano, went to the area to conduct surveillance. Hooper and Sambrano set themselves up in the woods, on the southwest side of the property. From where they were conducting surveillance, the officers could see the trailers. They could not see the entire house, but could see part of the house and part of the driveway leading up to the house.

In the meantime, Hinson took steps to obtain a search warrant. At that time, it was standard procedure for police officers to verify the ownership of the property they wanted to search prior to obtaining a search warrant. They did this in order to determine whether or not the owner of the property was the person they suspected of engaging in illegal activity. In order to verify ownership, most officers consulted with Richard E. Silva, who at that time was an appraiser in the County Assessor's Office. Mr. Silva had access to documents that allowed him to determine who owned a particular piece of property located in the county.

On the date of the events in question, Hinson attempted to contact Mr. Silva but Mr. Silva was apparently away from the office. Hinson did not determine whether Mr. Silva was out for the day or had only stepped out of the office for a moment. There are other methods of verifying the ownership of a piece of property, such as reviewing the deeds or real estate contracts on file at the county clerk's office, but Hinson did not check any of these sources.[5] Without taking any further

---

[5] Apparently, Hinson does not trust the staff at the county clerk's office because he thinks that they are "dopers" who will alert the subject of a search warrant of the impending search. There is no evidence in the record, however, that staff at the county clerk's office use illegal drugs.

action to verify the ownership of the properties in question, Hinson presented a search warrant affidavit to a magistrate.

In the affidavit, Hinson stated that: Mr. Hammonds "had five firearms, approximately 3/4 ounce of methamphetamine, and scales in the tan and brown trailer located at 101 Prospect Road Lincoln County, New Mexico within the past 72 hours"; a confidential informant saw numerous 1/4 ounce bags of marijuana in a dresser drawer in a room inside the trailer; Mr. Hammonds was a convicted felon; Mr. Hammonds lived at 101 Prospect Road; all of the items to be seized are commonly used by drug dealers to package and prepare methamphetamine and marijuana for resale; "drug dealers will hide and store their controlled substances in out buildings and vehicles on their property"; and the confidential informant relied upon had provided reliable information in the past. Thus, the only information presented in the affidavit relating Mr. Hammonds's drug-related activities in any way to Ms. Muir's residence was the statement that "drug dealers will hide and store their controlled substances in out buildings and vehicles on their property."

The magistrate issued a search warrant authorizing a search of the entire property, including what was referred to as a "red wooden building." The white mobile home, which set Ms. Muir's residence apart from the trailers, was specifically excluded from the search warrant because the confidential informant had told Hooper that the people who lived in the white mobile home were not involved in the drug-dealing activities. Had any of the officers determined that Ms. Muir owned the property, they would not have sought a search warrant to search her residence and would not have included her residence in the ensuing search.

The search warrant was executed that afternoon by members of the Lincoln County Narcotics Enforcement Unit and other law enforcement agencies, including the Lincoln County

Sheriff's Department and the Ruidoso Police Department. There is a dispute as to how many officers were sent to secure Ms. Muir's residence. Hinson stated in his affidavit that most of the officers were sent to Mr. Hammonds's trailer and only two officers were sent to Ms. Muir's residence. Hinson testified in his deposition, however, that three officers were sent to Ms. Muir's residence. One of the officers who executed the warrant testified in deposition that he and another officer were assigned to search the house after other agents had secured it, and that when he approached the house, he saw "a couple other people come up," and then heard "a bunch of shouting and yelling." Resp. to Mot. for Summ. J., Ex. F at 6, 9. Ms. Muir testified in her deposition that she saw officers coming "out of the trees, coming at me," that they were coming from "all the way around the house," from "every direction," and that the "whole, entire house was surrounded." Mot. for Summ. J., Ex. C at 28.

In any event, the officers approached Ms. Muir's residence, armed with semiautomatic weapons. One of them tore off a door to the house. Ms. Muir was outside and saw the officers approaching. She heard them cock their guns. They ordered her to the ground. She attempted to drop to the ground voluntarily, but found herself on a pile of rocks, barefoot, and one of the officers then shoved her to the ground. Ms. Muir has a dog who was apparently attempting to prevent the officers from harming her by sitting on her back while she lay on the ground. Three times, an officer attempted to move the dog and the dog turned to bite the officer. Apparently the dog actually bit one of the officers. The officers were finally able to handcuff Ms. Muir. The officer who handcuffed Ms. Muir was not a member of the Lincoln County Narcotics Enforcement Unit or the Lincoln County Sheriff's Department. Hinson testified in deposition that he would have shot the dog, but that he never got a clear shot. The dog was eventually sprayed

with mace.  Hinson was not the officer who sprayed the dog with mace.  Ms. Muir was left on the ground, handcuffed, for approximately fifteen minutes.  Ms. Muir's residence was then searched.[6]

After Ms. Muir was placed in handcuffs, the officers holstered their weapons and did not draw them again.  Ms. Muir asked Hinson what was happening and he told her that the officers were executing a search warrant for Mr. Hammonds's property.  Ms. Muir told Hinson that she owned the property and that the house was her residence.  Hinson then unhandcuffed Ms. Muir and ordered the officer searching the residence to stop doing so.

Ms. Muir commenced this action by filing a complaint against Hinson and Lincoln County in the Twelfth Judicial District Court, Lincoln County, of the State of New Mexico.  Defendants timely removed the action to this Court.  In her complaint, Ms. Muir set forth the following causes of action: (1) Defendants unlawfully entered and remained in her home without her consent, without a warrant, and without probable cause, in violation of the Fourth Amendment; (2) Defendants unlawfully detained her without reasonable suspicion and without probable cause, in violation of the Fourth Amendment; and (3) Defendants' actions constituted false

---

[6]     There is a dispute as to the extent of this search.  Hinson stated in his affidavit that a protective sweep was conducted to make sure there was no one else present.  Another officer, however, testified in deposition that he looked through the drawers and nightstand next to Ms. Muir's bed and specifically characterized his actions as a "search."  In any event, a protective sweep is a "search" under the Fourth Amendment which, when not made incident to an arrest, must be justified by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  Therefore, a search did occur here.  The degree of the intrusion will depend on the facts as they are ultimately determined by the factfinder.

imprisonment, wrongful arrest, assault and battery under the New Mexico Tort Claims Act.[7]
Ms. Muir requested compensatory damages against Hinson and Lincoln County, along with costs,
and punitive damages against Hinson, along with costs and reasonable attorney's fees.

Defendants filed a Motion for Summary Judgment, arguing that (1) Plaintiff failed to state
a claim under 42 U.S.C. § 1983 against Lincoln County; (2) Plaintiff has not suffered a
constitutional violation; (3) alternatively, Hinson is entitled to qualified immunity; and (4) Plaintiff
failed to present a viable tort claim against either Hinson or Lincoln County. Plaintiff timely
responded to the summary judgment motion and Defendants have filed a timely reply.

Plaintiff has also filed a Motion to Supplement the Record. Plaintiff had submitted copies
of photographs in connection with her Response to Defendants' Motion for Summary Judgment.
Defendants asserted in their reply that the Court should not consider the photographs because
they had not been properly authenticated. Plaintiff now seeks to supplement the record with an
affidavit which, she contends, authenticates the photographs. Defendants oppose Plaintiff's
motion.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is
appropriate when the court, viewing the record in the light most favorable to the non-moving
party, determines that "there is no genuine dispute over a material fact and the moving party is
entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th

---

[7]     Apparently, an excessive force claim was raised in the Initial Pretrial Report and
Defendants have responded to this claim. However, no cause of action for excessive force was
presented in the complaint and the issue was not addressed at all in Plaintiff's Response to
Defendant's Motion for Summary Judgment.

Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

Whether to permit a party to supplement its pleadings at the summary judgment stage is within the discretion of the District Court. *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 894 (10th Cir. 1997). Any supplemental filings must comply with Local Rule 7.6. *See Nagol v. State of N.M.*, 923 F. Supp. 190, 191 n.1 (D.N.M. 1996).

# ANALYSIS

## 1.      Jurisdiction and Applicable Law

This Court has original jurisdiction over Plaintiff's Fourth Amendment claims under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiff's state law tort claims under 28 U.S.C. § 1367(a).  Plaintiff filed this action in state court and Defendants timely removed the action to this Court under 28 U.S.C. § 1441(a).  Plaintiff's Fourth Amendment claims are brought under 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

Plaintiff's state law tort claims are permitted by the limitation provisions of the New Mexico Tort Claims Act.  *See* N.M.S.A. § 41-4-12 (1978).  As such, these claims are evaluated under common law negligence standards.  *See Methola v. County of Eddy*, 622 P.2d 234, 239 (1980) ("In the event a suit is instituted as permitted and limited by Section 41-4-12 of the New Mexico Tort Claims Act, then the established law of negligence and damages shall apply to the claims as well as to all defenses which may be available to the defendants in those suits.")

## 2.      Plaintiff's Motion to Supplement the Record

In reviewing a summary judgment motion, the court is permitted to consider only that evidence which is admissible at trial.[8]  *See Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1021 (10th Cir. 2001); *see also Mays v. Rhodes*, – F.3d – , 2001 WL 726802, *3 (8th Cir. 2001)

---

[8]      The evidence need not, however, be presented in a form that would be admissible at trial. *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F.Supp.2d 1258, 1263 (D. Kan. 1998).

(quoting *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996)). Evidence submitted in support of a summary judgment motion may, therefore, be considered only if it is both authenticated and admissible.  *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14[2][c] (3d ed.).  The authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  At the summary judgment stage, this test is met if the proponent shows that: (1) the document sought to be authenticated is attached to an affidavit which conforms to Rule 56(e); and (2) the affiant is a competent witness through whom the document can be received into evidence at trial.  *See IBP Inc. v. Mercantile Bank of Topeka*, 6 F.Supp.2d 1258, 1263 (D. Kan. 1998); *see also Fioriglio v. City of Atlantic City*, 996 F.Supp. 379, 385 (D.N.J. 1998).

Defendants contend in their Reply to Plaintiff's Response to their Motion for Summary Judgment that the pictures submitted in support of Plaintiff's Response, *see* Resp. to Mot. for Summ. J., Ex. H, should not be considered because, as they have not been properly authenticated, they are inadmissible.  Plaintiff now seeks to supplement the record with an affidavit which, she contends, establishes the authenticity of the pictures.  Therefore, Plaintiff does not appear to dispute Defendants' contention that the pictures, as originally submitted, were unauthenticated and, thus, inadmissible.

The Court agrees that the photographs, as originally submitted, were not properly authenticated.  Without any supporting affidavit, therefore, the Court could not properly consider them in ruling on Defendants' summary judgment motion.  *See IBP Inc.*, 6 F.Supp.2d at 1263; *Fioriglio*, 996 F.Supp. at 385.  However, Plaintiff has now come forward with an affidavit to establish the authenticity of the photographs.  Plaintiff states that she took several pictures within

a month of the incident in question.  *See* Mot. to Supplement R., Aff. at ¶ 2.  Exhibits H4, H10,

H11, H12, H13, H14, and H15 to Plaintiff's Response to Defendant's Motion for Summary

Judgment are pictures that Plaintiff took within a month of the incident.  *See id.* at ¶ 4.  Plaintiff

also states that her attorney, Joseph Kennedy, came to her property to take pictures in February

2001.  *See id.* at ¶ 3.  Exhibits H1, H2, H3, H5, H6, H7, H8, and H9 to Plaintiff's Response to

Defendant's Motion for Summary Judgment are pictures that Plaintiff's attorney took in February

2001.  *See id.* at ¶ 4.  Defense counsel was present when Mr. Kennedy took these pictures.  *See*

*id.* at ¶ 3.

      Plaintiff states that the pictures she took correctly depict the appearance of her property

within one month of the incident and that the pictures Mr. Kennedy took correctly depict the

appearance of her property in February 2001.  *See id.* at ¶ 5.  She also sets forth the ways in

which the appearance of her property, as depicted in both sets of pictures, differs from the

appearance of her property on the date of the incident.  *See id.* at ¶¶ 6-8.

      The Court finds that Plaintiff's affidavit conforms to the requirements of Rule 56(e) and

there is nothing in the record to indicate that Plaintiff is not a competent witness through whom

the evidence may be received into evidence.  Therefore, the Court is satisfied that Plaintiff's

affidavit is sufficient to establish that the pictures are what she says they are.  *See* Fed. R. Evid.

901.  That the appearance of Plaintiff's property as reflected in the pictures differs from the

appearance of her property on the date of the incident does not preclude the pictures from being

considered.  This issue goes to weight, not admissibility.  The Court is capable of determining

what weight may appropriately be given the photographs and rendering its decision accordingly.

For the foregoing reasons, Plaintiff's Motion to Supplement the Record will be granted.

3.      **Defendants' Motion for Summary Judgment**

a.      **Municipal Liability**

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 690 (1978). Local governing bodies may also be liable under § 1983 for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* Therefore, in order to be liable directly under § 1983, a local governing body must have acted unconstitutionally pursuant to an official policy or custom.[9] *See id.* at 694; *see also Brown v. Reardon*, 770 F.2d 896, 900-01 (10th Cir. 1985).

Plaintiff did not allege in her complaint that any of the actions complained of were taken pursuant to a policy or custom of the Lincoln County government. Defendants presented this argument in their Motion for Summary Judgment and Plaintiff completely failed to address it in her Response. Plaintiff has not come forward with any allegation, let alone any evidence to support an allegation, that the test for municipal liability under *Monell* is satisfied here. Accordingly, the Court finds that Lincoln County is entitled to judgment as a matter of law with respect to Plaintiff's Fourth Amendment claims and will, therefore, grant Lincoln County's

_____

[9]      *Monell* involved the liability, under § 1983, of a city government. The rules governing municipal liability under § 1983 have since been extended to county governments as well. *See, e.g., McMillian v. Monroe County, Ala.*, 520 U.S. 781, 783 (1997) ("If the sheriff's actions constitute county 'policy,' then the county is liable for them.")

Motion for Summary Judgment as to these two claims.

### b.    Unlawful Search

Plaintiff's argument that Defendants unlawfully searched her home in violation of the Fourth Amendment is three-fold.  First, Plaintiff argues that the search warrant in this case did not describe her home with sufficient particularity to justify the search.  Second, Plaintiff argues that if Hinson did not know that the "red wooden building" was a home, then his pre-warrant investigation was objectively unreasonable.  Third, Plaintiff argues that the officers did not have probable cause to believe that drugs or contraband would be found at her home and that, therefore, the warrant itself did not satisfy the Fourth Amendment's probable cause requirement.

### i.    Particularity of warrant and scope of search

On its face, the Fourth Amendment requires that a search warrant particularly describe the place to be searched and the persons or things to be seized.[10]  The "manifest purpose" of this requirement was to "prevent general searches."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). It is well established, then, that the particularity requirement was intended to ensure "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Id.*; *see also United States v. Ellis*, 971 F.2d 701, 703 (11th Cir. 1992).

Moreover, the Supreme Court has repeatedly warned that special care is to be taken to ensure that searches of people's homes conform strictly to the Fourth Amendment's requirements.

---

[10]    "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. 4.

*See Payton v. New York*, 445 U.S. 573, 585-86 (1980) ("the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotations omitted). Therefore, many courts, including the Tenth Circuit, have ruled that special care must be taken to ensure that a warrant authorizing a search of a residence conform to the particularity requirement. *See United States v. Dahlman*, 13 F.3d 1391, 1396 (10th Cir.), *cert. denied* 511 U.S. 1045 (1993) ("We hold that where officers intend to search a residence, the description of the property to be searched may not be so ambiguous as to leave doubt as to the scope of the search.")

The Court finds that resolution of Plaintiff's Fourth Amendment unlawful search claim is directly controlled by *Maryland v. Garrison*, where the Supreme Court ruled that a search of Mr. Garrison's home, conducted pursuant to a warrant authorizing a search of an area containing multiple residences, was lawful because the officers' conduct under the circumstances was reasonable. Because *Garrison* directly controls the outcome of the Fourth Amendment issue presented here, the Court will discuss the facts of that case, as well as the Supreme Court's analysis of the Fourth Amendment issue, in detail.

In *Garrison*, police officers received information from a reliable confidential informant that Lawrence McWebb was dealing drugs and that Mr. McWebb lived on the third floor of a building located at 2036 Park Avenue, in Baltimore, Maryland. *See Garrison*, 480 U.S. at 81. Before seeking a warrant, the officers conducted an investigation by verifying the information that they had obtained from the informant, conducting an exterior examination of the three-story building at 2036 Park Avenue, and making an inquiry of the utility company. *See id.* After conducting this investigation, the police came to the conclusion that there was only one apartment

on the third floor of 2036 Park Avenue, and that the apartment was inhabited by Mr. McWebb. *See id.* The officers then proceeded execute the warrant by entering the building, accompanied by Mr. McWebb, and climbing the stairs to the third floor. Upon reaching the third floor, they encountered two doors, which were both open. Mr. Garrison was standing in the hallway area. The officers searched the entire floor, believing that they were searching Mr. McWebb's apartment. They found heroin, cash, and drug paraphernalia. Only after they found these objects did they realize that the third floor actually consisted of two apartments and that the heroin, cash, and drug paraphernalia had been located in Mr. Garrison's residence. As soon as they came to that realization, the search was discontinued. *See id.*

Mr. Garrison was convicted of possession with intent to distribute heroin after unsuccessfully seeking to have the heroin suppressed. The court of appeals reversed the conviction, ruling that the warrant did not authorize a search of Mr. Garrison's apartment. *See id.* at 82. The Supreme Court reversed, ruling that: (1) because the police reasonably believed the third floor of 2036 Park Avenue contained only one apartment, the search warrant satisfied the Fourth Amendment's particularity requirement; and (2) because the officers made an honest mistake, reasonably believing that they were searching only Mr. McWebb's apartment, the search of Mr. Garrison's apartment did not violate Mr. Garrison's constitutional right to be secure in his home. *See id.* at 84-85, 86-87.

Like *Maryland v. Garrison*, this case "presents two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Id.* at 84 (citing *Dalia v. United States*, 441 U.S. 238, 258 (1979)). The factual circumstances underlying this case are remarkably similar to those presented in

*Garrison*, with respect to both constitutional issues.  However, there is one critical exception: in *Garrison*, the officers' conduct was reasonable under the circumstances.

Here, like in *Garrison*, the police were informed by a reliable informant that a particular individual was dealing drugs out of his residence.  Here, like in *Garrison*, another individual, whom the police did not suspect of dealing drugs, resided in a separate residence, which was located in the same general area as the suspect's residence.  Here, like in *Garrison*, the police falsely believed that the individual suspected of dealing drugs owned or controlled the entire area.  Here, like in *Garrison*, the police executed the warrant, searching not only the suspect's residence, but also the residence of the person not suspected of dealing drugs.  Here, like in *Garrison*, when the police discovered their mistake, they ceased searching the residence of the person not suspected of dealing drugs.[11]

In *Garrison*, however, the police conducted an investigation prior to seeking a warrant to ensure that the place they wished to search was actually occupied by Mr. McWebb.  They also conducted an exterior examination of the building in question.  It is entirely reasonable that such an investigation would lead the officers to the conclusion that there was only one apartment on the third floor of that building.  Finally, they made an inquiry of the utility company.  Based on the results of this investigation, they came to the conclusion that there was only one apartment on the third floor of the building in question.  The trial court made an explicit finding, upheld by two

---

[11]   The residences in question markedly differ.  In *Garrison*, the suspect resided in an apartment on the third floor of a rowhouse in downtown Baltimore, Maryland.  The distance between his apartment and that of Mr. Garrison was presumably minimal.  Here, the suspect resided in a trailer located on a plot of land in rural New Mexico.  The distance between his residence and that of Plaintiff was somewhere between thirty and two hundred yards.  The Court finds that these differences, however, are not material to the Fourth Amendment questions presented.

state appellate tribunals, that the officers' conclusion was reasonable.  *See id.* at 81.

Moreover, the Supreme Court found that once the officers were in the building, their failure to realize their mistake immediately was also reasonable.  *See id.* at 87.  There were no obvious indicia that there was a separate apartment on the third floor, and Mr. McWebb did not say anything to the police that would have suggested the existence of two apartments.  *See id.* at 88 n.12.  When the officers encountered Mr. Garrison, he did not inform them that he and Mr. McWebb lived in separate apartments.  *See id.*  For all of these reasons, the Court held that the officers' "failure to realize the overbreath of the warrant was objectively understandable and reasonable."  *See id.* at 88.   Therefore, the Court held that the search of Mr. Garrison's home did not violate the Fourth Amendment.

These findings of reasonableness were critical to the Supreme Court's ruling in *Garrison*. With respect to the warrant particularity requirement, the Court stated the following:

> Plainly, if the officers had known, *or even if they should have known*, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude [Mr. Garrison's] apartment from the scope of the requested warrant.

*Id.* at 85 (emphasis added); *accord United States v. Shamaeizadeh*, 80 F.3d 1131, 1138 (6th Cir. 1996) ("if the officers knew or should have known that [the building in question] was divided into separate residences, then they would be required to exclude the basement apartment from the scope of the warrant if they only had probable cause to search the upper floor.")  In *Garrison*, the officers did not know, and could not reasonably have known, that there were two apartments on the third floor.

Here, in contrast, a reasonable investigation would have revealed that Plaintiff owned the

entire property and that the "red wooden building" was, in fact, a separate dwelling. Agent Hinson did not know, and it has not to this date been revealed, whether Mr. Silva was out of his office momentarily or for a longer period of time. There is nothing in the record to indicate that he inquired as to when Mr. Silva would return or as to whether Mr. Silva was accessible by telephone. Hinson also did not attempt to obtain information relating to the ownership of the property in question by any other means.[12]

Defendants maintain that Hinson was not required to conduct any further investigation into the ownership or occupancy of the property in question because of Hinson's reasonable belief that the drugs were being sold quickly and would not last. *See* Mem. in Supp. of Mot. for Summ. J. at 7. Defendants draw the Court's attention to case law holding that police officers may search a residence in the absence of a search warrant when the officers have probable cause to believe that there are drugs in the residence which are being sold quickly and argue that because "Hinson could have legally searched the property without a warrant, his failure to verify ownership of the property cannot be said to have been unreasonable." Mem. in Supp. of Mot. for Summ. J. at 7-8 (citing *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir. 1983); *United States v. Aquino*, 836 F.2d 1268 (10th Cir. 1988)).

The Court finds Defendants' argument on this point unpersuasive. "It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement." *United States v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001). It is certainly true, as Defendants maintain, that the "exigent circumstances" doctrine is an

---

[12]     That Agent Hinson does not trust clerk's office staff because of his subjective belief that they use drugs does not excuse him from complying with the Fourth Amendment's requirements.

exception to the warrant requirement. Under that doctrine, police may conduct a warrantless search of a residence if the police have probable cause to believe there are drugs in the residence and if the police have an "objectively reasonable fear" that the drugs may be removed or destroyed before a warrant may be obtained. *See, e.g., United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir. 2001) (citing *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)); *accord Edwards*, 242 F.3d at 939 (citing *Carroll v. United States*, 267 U.S. 132 (1925)) (search of car not justified under exigent circumstances doctrine).

However, the Court is not persuaded that the rationale behind the exigent circumstances exception to the warrant requirement justifies the search that took place here. First of all, this was not a warrantless search, so the exigent circumstances doctrine is simply not applicable. Furthermore, the doctrine applies only when the police have *both* probable cause to believe that there are drugs or contraband in the place to be searched *and* an objectively reasonable fear that the drugs will be removed or destroyed before a warrant is obtained. It is undisputed here that the police had probable cause to believe that there were drugs in Mr. Hammonds's residence, the tan and brown trailer on Plaintiff's property. There is a question as to whether the police had probable cause to believe that there were drugs in Plaintiff's residence, *see infra*.

Assuming the police did have probable cause to believe that there were drugs in Plaintiff's residence, however, they had no reason to fear that those drugs would be removed or destroyed. The confidential informant told Hooper that Mr. Hammonds was selling drugs *out of his residence*, and that the drugs were being sold "quickly." He also told them there was a "potential" that some of the other "buildings" on the property might contain drugs or weapons. They had no reason to think that drugs were being sold out of any "building" on the property

other than Mr. Hammond's residence. Therefore, they could not have reasonably feared that any

drugs or weapons that might possibly be in the other buildings would be sold before a warrant

could be obtained. Accordingly, the Court finds that Hinson's reasonable belief that drugs were

being sold quickly out of Mr. Hammonds's residence did not justify his failure to conduct a

reasonable investigation into the ownership and occupancy of Plaintiff's residence.

Moreover, there were numerous external indicia of Plaintiff's occupancy of the residence

that the officers conducting the surveillance failed to detect. For example, Plaintiff's's residence

was at a higher elevation than, and a substantial distance from, the trailer. Her residence and

Mr. Hammonds's residence were accessed by separate driveways. Plaintiff's residence was also

separated from Mr. Hammonds's trailer by a white mobile home that was expressly excluded from

the search. All of this could have been observed by the officers from where they were conducting

their surveillance. The officers conducting the surveillance could not actually see the "red

wooden building" on the property; however, had they positioned themselves in a manner that

allowed them to see it, it would have been obvious that it was a house, and not simply a

"building."

For all of these reasons, the Court finds that this case is distinguishable from *Garrison* on

the issue of pre-warrant investigation. In *Garrison*, the officers conducted a reasonable

investigation and came to a reasonable conclusion that the third floor contained only one

apartment. The officers did not conduct a reasonable investigation in this case. Had they done

so, they would have realized that the "red wooden building" was a house and that all of the

property was owned by Plaintiff, and they would not have included Plaintiff's house in the search

warrant. Accordingly, the Court finds that under *Garrison*, the warrant in this case was

20

unconstitutionally broad and will deny Defendants' Motion for Summary Judgment as to this issue.

The Court also finds that the execution of the warrant in this case was not reasonable. As explained above, the trial court's finding in *Garrison* that the officers' pre-warrant investigation was reasonable was critical to the Supreme Court's determination that the warrant in that case satisfied the Fourth Amendment's particularity requirement. It is equally clear that the Supreme Court's determination that the officers' conduct during the execution of the warrant was reasonable was critical to its determination that the execution of the warrant did not impermissibly exceed the scope of the authorized search. With respect to this issue, the Court held that

> If the officers had known, *or should have known*, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment. . . . [T]he validity of the search of [Mr. Garrison's] apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable. Here it unquestionably was. The objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises.

*Garrison*, 480 U.S. at 87-88 (emphasis added).

Again, the facts of this case are markedly different. As explained above, there were numerous external factors that should have alerted the officers to the fact that the "red wooden building" was someone else's home. *See supra* at 19. The Court declines to list these factors again here. It is sufficient to simply note that this "building" should have been identified as a house as soon as the warrant was executed. At that time, the officers became obligated to limit their search to Mr. Hammonds's trailer. Accordingly, Defendants' Motion for Summary

Judgment will be denied as to this issue as well.

## ii. Probable cause

Defendants also contend that Plaintiff's argument that the search warrant in this case was not supported by probable cause is untenable. *See* Mem. in Supp. of Mot. for Summ. J. at 9. First, Defendants note that the confidential informant here informed Hooper (falsely) that Mr. Hammonds owned and/or controlled all of the buildings on the property except the white trailer. *See id.* Second, Defendants note that the confidential informant told Hooper that all of the buildings owned or controlled by Mr. Hammonds potentially contained drugs or weapons, and that Hinson stated in the affidavit that he knew "drug dealers will hide and store their controlled substances in outbuildings and vehicles on their property." *See id.* at 9-10.

"Generally a single warrant may authorize the search of several different places or residences; however probable cause must be shown for searching each area." *United States v. Rios*, 611 F.2d 1335, 1347 (10th Cir. 1979) (citing *United States v. Olt*, 492 F.2d 910, 911 (6th Cir. 1974)); *accord Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("We have consistently held that probable cause to search one apartment in a multi-unit building does not support a warrant authorizing a search of the entire building.") Therefore, if the officers did not have probable cause to believe that Plaintiff's residence contained drugs or other contraband, the warrant was invalid as to her house.

In considering a claim that a search warrant lacked probable cause, the Court "reviews the sufficiency of the affidavit upon which a warrant is issued by looking at the totality of the circumstances and simply ensuring 'that the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (quoting

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). "Probable cause means that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238); *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996)).

As explained above, Defendants have provided evidence demonstrating that the confidential informant told Hooper that Mr. Hammonds owned or controlled the entire property and that drugs or weapons could "potentially" be found in any of the buildings thereon, other than the white mobile home. Plaintiff has not come forward with any evidence to dispute these assertions. Therefore, there is no genuine dispute as to this issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") Moreover, the officer told the magistrate that he knew, based on his training and experience, that "drug dealers will hide and store their controlled substances in outbuildings and vehicles on their property." Resp. to Mot. for Summ. J., Ex. G. This Court is required to give "great deference" to a magistrate's decision to issue a warrant. *See United States v. Tuter*, 240 F.3d 1292, 1295 (10th Cir. 2001) (citing *United States v. Le*, 173 F.3d 1258, 1265 (10th Cir. 1999)). According the appropriate degree of deference, the Court finds that the search warrant in this case was based on probable cause.

### iii.    Qualified Immunity

Lastly, Defendants claim that Hinson is entitled to qualified immunity as to all of these issues. "Qualified immunity protects government officials from individual liability in a § 1983 action unless the officials violated clearly established constitutional rights. *See Radecki v. Barela*, 146 F.3d 1227, 1228 (10th Cir. 1998) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to defeat a qualified immunity defense, a plaintiff must show: (1) that the defendant's

actions violated a constitutional or statutory right; and (2) that the constitutional or statutory

rights the defendant allegedly violated were clearly established at the time of the conduct at issue.

*See id.* (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)).  To demonstrate

that the right in question was "clearly established," the Plaintiff must show that the "contours of

the right [are] sufficiently clear that a reasonable official would understand that what he is doing

violates that right."  *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1278 (10th Cir. 1998)

(quoting *Anderson, v. Creighton*, 483 U.S. at 640).  The Plaintiff is required to demonstrate

"some, but not identical, correspondence between the cases cited and the factual situation in the

case at hand."  *Finn v. New Mexico*, 249 F.3d 1241, 1250 (10th Cir. 2001) (citing *Horstkoetter*,

159 at 1278).

> *Maryland v. Garrison*, which the Court has already ruled directly controls this case, was

decided on February 24, 1987.  Defendants were on notice as of that date that they are required

to conduct a reasonable investigation prior to seeking a search warrant for a piece of property

containing multiple residences.  Moreover, there is more than "some" factual correspondence

between *Maryland v. Garrison* and this case.  Therefore, Hinson is not entitled to qualified

immunity with respect to Plaintiff's claim that the warrant was unconstitutionally broad and that

the ensuing search violated her Fourth Amendment right to be secure in her home.[13]

> **c.      Unlawful Seizure**

> Plaintiff alleged in her complaint that Defendants deprived her of her Fourth Amendment

right to be free from unreasonable seizures upon her person by detaining her, arresting her and

---

[13]     Because the Court has already ruled that the warrant in this case was based on probable
cause, the Court will not address Defendants' argument that Hinson is entitled to qualified
immunity with respect to this issue.

charging her with misdemeanor charges without probable cause. Defendants argue in their summary judgment motion that Plaintiff has failed to satisfy her burden of demonstrating that the seizure of her person was unconstitutional.[14] Defendants also argue that Hinson cannot be liable for unconstitutionally seizing Plaintiff because it was not Hinson who ordered her down or handcuffed her.

Defendants have come forward with admissible evidence showing that Hinson did not order Plaintiff to the ground and did not place her in handcuffs. The evidence shows, in fact, that Hinson arrived on the scene shortly after Plaintiff was in handcuffs. Plaintiff did not address the unlawful detention argument at all in her Response to Defendants' Motion for Summary Judgment, nor has she come forward with any evidence to create a genuine dispute of material fact with respect to this issue. Therefore, the Court finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiff's claim that Defendants unlawfully seized her in violation of the Fourth Amendment.

### d.      State Tort Liability

#### i.      Defendants' liability

Defendants argue that neither Hinson nor Lincoln County may be held liable for any state torts committed against Plaintiff because Hinson did not engage in any tortious conduct. It is undisputed that Hinson did not shove Plaintiff to the ground, handcuff her, or spray mace at her or her dog.[15] Plaintiff maintains, however, that Hinson and Lincoln County may be held liable for

---

[14]    Defendants do not contend that the events in question did not constitute a "seizure" under controlling Fourth Amendment. They contend only that the seizure was reasonable. *See* Mem. in Supp. of Mot. for Summ. J. at 13 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[15]    It is not clear from the record whether or not Hinson raised his gun towards Plaintiff.

the allegedly tortious conduct committed by the other officers who participated in the execution of the search warrant. The Court agrees.

The New Mexico Tort Claims Act was enacted in response to the New Mexico Supreme Court's decision in *Hicks v. State*, 544 P.2d 1153 (1975), which abolished judicially recognized sovereign immunity. *See Methola v. County of Eddy*, 622 P. 2d at 236. Under the Act, governmental actors are immune from tort liability, except that this immunity "does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." N.M.S.A. § 41-4-12 (1978). In *Methola*, the New Mexico Supreme Court ruled that because "the Act is in derogation of [a plaintiff's] common law rights to sue [governmental actors] for negligence, the Act is to be strictly construed insofar as it modifies the common law." *Id.* at 238. The Court went on to hold that a law enforcement officer need not actually commit the conduct in question in order to be liable under § 41-4-12; under the terms of the statute, the officer need only "cause" the injury complained of. *See id.* at 237-39.

It is undisputed that Hinson was a "law enforcement officer."[16] Therefore, to the extent that he caused the injury in question, he may be held liable for it. "The words 'caused by' do not

---

[16] A "law enforcement officer" is "any full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor." N.M.S.A. § 41-4-3(D); *see also Weinstein v. City of Santa Fe*, 916 P.2d 1313, 1317 (N.M. 1996) (construing meaning of "law enforcement officer.")

differ significantly from the usual meaning of proximate cause found in ordinary negligence cases." *Methola*, 622 P.2d at 238. Therefore, to determine whether the injury complained of was caused by Agent Hinson, the Court must apply traditional principles of "proximate cause" analysis. In New Mexico, proximate cause is generally a question of fact to be determined by the factfinder. *See Pollock v. State Highway and Trans. Dept.*, 984 P.2d 768, 773 (N.M. Ct. App.1999) (internal quotations omitted). "The only time that this is not true is 'when facts regarding causation are undisputed and all reasonable inferences [from those facts] are plain, consistent and uncontradictory.'" *Id.* at 773-774 (quoting *Lerma v. State Highway Dep't.*, 877 P.2d 1085, 1087-88 (1994)). The Court finds that this narrow exception does not apply here. It cannot be said that the facts regarding causation here are undisputed or that all reasonable inferences from those facts "are plain, consistent and uncontradictory." The Court has ruled that the officers failed to conduct a reasonable pre-warrant investigation into the ownership and occupancy of Plaintiff's residence and that the execution of the search warrant exceeded the permissible scope of the search. Whether these Fourth Amendment violations "caused" Plaintiff's injuries is a question of fact for the factfinder.

The Court also finds that Lincoln County may be held vicariously liable for any tortious conduct committed by Lincoln County officers during the execution of the search warrant. Lincoln County is not a "law enforcement officer." Nevertheless, it is clear that in New Mexico, a county government may be held vicariously liable for the tortious conduct committed by a county law enforcement officer when the tortious conduct is committed within the scope of the officer's duties. *See California First Bank v. State*, 801 P.2d 646, 651 (1990) (citing RESTATEMENT (SECOND) OF AGENCY § 220(1) (1958); *see also Weinstein*, 916 P.2d at 1318 (quoting *Silva v.*

*State*, 745 P.2d 380, 385 (1987) ("A governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived."). There is no question that any tortious conduct committed by the officers during the execution of the search warrant was committed within the scope of the officer's duties. Therefore, the Court finds that Lincoln County may be held vicariously liable under the New Mexico Tort Claim Act for any such tortious conduct.

Defendants next argue that even if Hinson and Lincoln County can be liable for torts committed by other officers, there is no liability here because no tort was committed. In order to analyze this claim, the Court will briefly address the elements of each of the torts alleged by Plaintiff to have been committed and determine whether there is a genuine issue of material fact with respect to any of them.

### ii. False Imprisonment

"Under New Mexico law, '[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" *Romero v. Sanchez*, 895 P.2d 212, 215 (N.M. 1995) (citing N.M.S.A. § 30-4-3 (Repl. Pamp. 1994). "Unlawful detention has similar requirements." *Id.* Whether the officers intentionally confined or restrained Plaintiff without her consent are questions of fact. Defendants maintain that liability cannot attach because the officers did not know that they lacked lawful authority to restrain Plaintiff. What the officers knew, however, is also a question of fact for the factfinder. Therefore, the Court finds that Defendants are not entitled to summary judgment as to Plaintiff's false imprisonment claim.

### iii.    Assault

"An assault requires a 'threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery.'" *Romero*, 895 P.2d at 215 (quoting N.M.S.A. § 30-3-1(B) (Repl. Pamp. 1994). Here, Plaintiff has alleged that she saw numerous police officers approaching her with cocked semiautomatic weapons pointed in her direction. Whether Plaintiff had a reasonable fear that she was in danger of receiving an imminent battery is a question of fact for the factfinder.

Defendant maintains that the officers may not be liable, however, because "a peace officer who points a gun at someone as a conditional threat to use actual force if necessary is privileged from tort liability for assault." Mem. in Supp. of Mot. for Summ. J. at 12 (quoting 6 Am. Jur.2d, *Assault and Battery*, § 118). The Court has found only one federal or state case expressly relying on this principle in ruling on an assault claim, *see Garza v. United States*, 881 F.Supp. 1103, 1106 (S.D. Tex. 1995). In that case, the District Court for the Southern District of Texas based its holding primarily on a Fifth Circuit decision holding that a police officer does not commit excessive force in violation of the Fourth Amendment by merely pointing his gun at someone while performing his duties, *see Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223, 1231-32 (5th Cir. 1988).

The Court declines to adopt the reasoning of the Southern District of Texas in these case for the following reasons. First, it would be inappropriate for this Court to fashion a new principle under New Mexico law without the matter first having been considered at all by the New Mexico courts. *See Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1370 (7th Cir. 1985) ("[a] party who wants a court to adopt an innovative rule of state law should litigate in state rather

than federal court. . . . Federal judges are disinclined to make departures in areas of law that we have no responsibility for developing.")  Second, the Fifth Circuit in *Hinojosa* based its holding partly on the fact that the guns the officers pointed at the plaintiff in that case were not cocked.  In this case, there is a question of fact as to whether the officers' weapons were cocked when the officers approached Plaintiff.  Accordingly, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiff's assault claim.

### iv.    Battery

"An actor is subject to liability to another for battery if  (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results."  *State v. Ortega,* 827 P.2d 152, 155 (N.M. Ct. App. 1992) (citing RESTATEMENT (SECOND) OF TORTS § 18 (1965)).  Defendants ask the Court to rule that, as a matter of law, it is never a battery for a police officer to handcuff a person during the course of executing a search warrant.  *See* Mem. in Supp. of Summ. J. at 12.  The Court declines to do so. In any event, Plaintiff does not base her battery claim solely on the fact that she was handcuffed; she has also submitted evidence demonstrating that one of the officers pushed her down, onto a pile of rocks.  This creates a genuine issue of material fact as to whether a battery was committed upon her.  Accordingly, Defendants are not entitled to summary judgment as to Plaintiff's battery claim.

For the foregoing reasons, the Court finds that Lincoln County is entitled to judgment as a matter of law as to Plaintiff's Fourth Amendment claims brought under 42 U.S.C. § 1983; Agent Hinson is not entitled to judgment as a matter of law as to Plaintiff's claim that the search warrant

was unconstitutionally broad or as to her claim that the search of her house exceeded the permissible scope of the search; Agent Hinson is entitled to judgment as a matter of law as to Plaintiff's claim that the search warrant lacked probable cause; and neither Hinson nor Lincoln County is entitled to judgment as a matter of law as to Plaintiff's tort claims.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment **[Doc. No. 16]** is hereby **GRANTED in part**; Plaintiff's Motion to Supplement the Record **[Doc. No. 26]** is hereby **GRANTED**; and the Clerk's Office is hereby ordered to amend the caption to reflect that Plaintiff's first name is "Elynn," not "Elaine."

Dated this 25th day of October, 2001.

_____
Martha Vázquez
U. S. District Judge

Attorney for Plaintiffs
    Joseph P. Kennedy

Attorney for Defendants
    KELEHER & McLEOD, P.A.
    Sean Olivas
    Melanie Frassanito